United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANTHONY BERNARD SMITH,

Plaintiff,

v.

CONNIE GIPSON, et al.,

Defendants.

Case No. 20-cv-01110-WHO

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 25, 26

Plaintiff Anthony Smith, a devout Muslim, alleges that while he was housed at Pelican Bay State Prison ("Pelican Bay") in Facility D during Ramadan in 2019, he was unlawfully deprived of the regularly available Kosher Diet Program ("KDP") meals that he required to satisfy his sincere Muslim beliefs.[1]  Smith and defendants Connie Gipson (the director of CDCR), J. Williams (the Correctional Food Manager at Pelican Bay), and D. Blythe (the Captain of Facility D at Pelican Bay during the relevant time) have filed cross-motions for summary judgment.  There is no evidence to support Smith's fear that halal (permissible) foods were likely to be cross-contaminated by haram (impermissible) foods.  Defendants' policies and practices did not substantially burden his religious exercise.  For that reason and those that follow, I GRANT defendants' motion in full and DENY Smith's motion.

## BACKGROUND

### I.    MEAL PLANS AND PLAINTIFF SMITH'S BELIEFS

Smith been a participant on the KDP meal plan since March 2018.  He elected the KDP meals after reading about the possibility of "cross-contamination" through preparation of food using pots, pans, plates, or utensils to prepare haram foods.  Smith Decl. ¶¶ 5-6, 9 (explaining why

---

[1] Smith was subsequently transferred to Solano State Prison.  Declaration of Anthony Smith, Dkt. No. 27, ¶ 1.

Smith elected KDP meals and his understanding that Muslims are permitted to consumer kosher meals). Given his concerns with possible cross-contamination of the Religious Meat Alternative ("RMA") meals that Pelican Bay offered Muslim inmates,[2] he chose the KDP meals because they were prepared off-site, at a kosher facility, and double-wrapped before they were delivered to Pelican Bay. *Id*. ¶ 5.

It is undisputed that the KDP meals provided by the California Department of Corrections and Rehabilitation ("CDCR"), at least during the time Smith was housed at Pelican Bay, satisfy the religious requirements of practicing Jews and Muslims. For example, at the time Smith was at Pelican Bay it is undisputed that KDP meals were prepared off-site and double-wrapped to prevent cross-contamination with non-kosher foods.[3] According to defendants' testimony, the KDP meals had to be ordered in units of three meals (breakfast, lunch, and dinner) per day for each inmate, Williams Decl. ¶ 15, and no substitutions or alterations were allowed. Richey Decl., ¶ 17. In 2017, prison officials knew that the KDP meals were not shelf-stable according to the vendor that supplied them. Richey Decl. ¶ 19 & Ex. B. That meant KDP meals deteriorated at room temperature and needed to be consumed within four hours of preparation for safety reasons. *Id*. ¶¶ 9, 13, 20 & Ex. A (referring to California's food safety guidelines); Williams Decl. ¶ 21.

CDCR presents evidence that during the time Smith was housed at Pelican Bay, the prison offered Muslim inmates the RMA plan. Richey Decl. ¶ 5; Williams Decl. ¶ 12. During the relevant timeframe, Pelican Bay ordered both the KDP meals and the RMA meats from third-party food vendors. Richey Decl. ¶¶ 6, 16, 17; Williams Decl. ¶¶ 13-15. In the RMA plan, the halal meat – provided by a third-party and sent to Pelican Bay pre-cooked, frozen, and certified halal – is substituted for any chicken or beef entrée and is combined with vegetables from the mainline meal in the Pelican Bay kitchens. Williams Decl. ¶ 14.

---

[2] The RMA meal program was designed by CDCR to provide Muslim inmates halal-compliant meals. *See* Declaration of J. Williams, the Correctional Food Manager at Pelican Bay (Dkt. No. 25-4) ¶ 12; Declaration of Charles Richey (Dkt. No. 25-6), CDCR Chaplain and Community Resource Manager of the Religious Programs Oversight Unit, ¶ 5.

[3] Once at the prison, the double-wrapped KDP meals are heated, and served to the inmates with disposable utensils. *See* AGO000048 at 4.3 (Dkt. No. 28-2).

United States District Court
Northern District of California

Smith offers no evidence of actual cross-contamination of RMA meals at Pelican Bay.  He made his decision to receive KDP meals based on the risk that RMA meals served at Pelican Bay could be cross-contaminated: he understood that unlike the KDP meals, the RMA meals were prepared on-site at Pelican Bay, which did not have a "separate, secure" RMA food preparation station, and the RMA foods were not "double wrapped."  Smith Decl., ¶¶ 5-6.  He also believes that cross-contamination at Pelican Bay was likely given his experience working at San Quentin's kitchen, where he observed inadequately cleansed cookware, although he has no knowledge about the policies or practices at Pelican Bay.  Smith Depo. Tr. (Dkt. No. 35-2) at 133-134.

Neither party provides a clear definition of cross-contamination, but defendants' expert Mairaj Syed explains that cross-contamination between halal and haram foods will not occur when utensils or other cookware are washed to the point that "food remnants from prohibited foods are thoroughly eliminated, such that they are no longer perceivable by one's senses.  As long as washing practices entail thoroughly washing food preparation containers and utensils between different cooking sessions that may involve contact with forbidden substances, then Smith does not have sufficient evidence from a religious perspective for his belief that utensils cause cross-contamination."  Expert Report of M. Syed, Ph. D (Dkt. No. 25-1) at 5-6.

Smith relies repeatedly on *In re Garcia*, 202 Cal. App. 4th 892 (Cal. App. 3d Dist. 2012) to argue that his beliefs about cross-contamination are reasonable given the strictures required to produce kosher meals.  *See id*. at 898 ("The JKDP requires certification by a rabbi, separate utensils, dishes, and storage to ensure no contact between meat and dairy foods, and assembly in a separate kitchen area by trained staff.").  But he provides no evidence to support his view that kosher and halal requirements are coextensive, much less evidence regarding when cross-contamination might occur to kosher or halal foods.  The only evidence in this case regarding requirements to ensure halal-foods are not contaminated by haram-foods comes from Syed, who opines that proper food handling and cleansing techniques can prevent cross-contamination between halal and haram foods.  *See* Syed Expert Report at 5-6.  In this regard, the declaration of the Correctional Food Manager at Pelican Bay (defendant Williams) regarding use of those techniques to prepare the RMA meals at Pelican Bay stands unrebutted.  Williams Decl. ¶¶ 8-11.

## II.     RAMADAN POLICIES/MEMORANDA

In 2017, CDCR's then-director Kathleen Allison issued a "2017 Ramadan Memo" that directed that prison staff should not serve KDP meals to Muslim inmates during Ramadan because those meals are not shelf-stable. AGO000373-374 (Dkt. No. 28-2).  Ahead of Ramadan 2019, CDCR employee C. Richey drafted a memorandum articulating a meal policy that addresses the unique needs of Muslim inmates and reiterates that KDP meals were not shelf-stable and, therefore, were not appropriate for Ramadan participants who were fasting from sunrise to sundown.  Richey Decl. ¶¶ 13, 15, 20-21, 23.  On March 12, 2019, defendant Connie Gipson, the Director of the California Department of Corrections and Rehabilitation ("CDCR") Division of Adult Institutions, "reviewed, signed and authorized the distribution" of the guidance drafted by Richey (the "2019 Ramadan Memo").  Declaration of C. Gipson (Dkt. No. 25-2) ¶¶ 2-5.  Other than reviewing, signing, and authorizing the distribution of the 2019 Ramadan Memo, Gipson played no other role in its development or implementation.  *Id.* ¶ 2-6.

The Gipson Memo directed that California prisons could not serve Ramadan-participating inmates KDP meals during Ramadan because the Kosher meals were not shelf stable and could pose health risks to Ramadan participants.  Declaration of C. Gipson (Dkt. No. 25-2) ¶¶ 2-4.  The 2019 Ramadan Memo provided:

> The purpose of this memorandum is to provide information to institutional staff regarding meal service and inmate participation in the fast of Ramadan.
> * * *
> There are a variety of ways meals may be distributed, depending on operational need.  Most institutions have local procedures in place to facilitate the necessary meal schedule changes during Ramadan. One option may be to provide the evening meal in a paper tray or clamshell at regular dinner feeding time to be consumed after sunset. Breakfast and lunch bags could also be distributed with the evening meal.
> * * *
> Please note Kosher Diet Program (KDP) meals are not shelf stable and cannot be served to inmates participating in Ramadan. The Religious Meat Alternate Program (RMAP) and the mainline diet meals will be shelf stable to allow inmates to participate in the fast of Ramadan. Inmates who have been placed on the KDP may request transfer the RMAP.

AGO000384-385 (Dkt. No. 28-2); *cf.* AGO000388 (Dkt. No. 28-2, noting the 2019 Ramadan Policy was disseminated to CDCR associate directors, wardens, and food managers in 2020).

1    Under that guidance, defendants assert that KDP meal recipients were encouraged to sign

2    up for the RMA program if they planned to observe Ramadan in 2019. Richey Decl. ¶¶ 22-23 &

3    Ex. C; Williams Decl. ¶ 27.  The 2019 Ramadan Memo permitted Ramadan participating inmates

4    who are enrolled in the KDP to transfer diets "no later than Monday, April 29, 2019."  *See*

5    AGO000384. However, prison policy provides that an inmate can only transfer diets once per

6    year.  *See* AGO000184 (Dkt. No. 28-2, Religious Diet Program Agreement signed by Smith and

7    approved by Pelican Bay Community Resource Manager, Robert Losacco); Dkt. No. 28-3

8    ("Losacco Memo.," noting Smith's authorization to switch to the KDP diet and informing Smith

9    he cannot change his religious diet more than once a year).

10    Smith submits evidence that prison staff at Pelican Bay and at least one other prison did

11    not follow the original Ramadan Memo or the 2019 Ramadan Memo.  Pelican Bay served

12    Ramadan-observing inmates KDP meals during Ramadan 2018, San Quentin continued to serve

13    KDP meals to Ramadan participants in 2019, and Pelican Bay served KDP meals to Smith for the

14    first two days of Ramadan 2019.  Smith Decl. ¶ 10; *see also* Declaration of Damien Mitchell

15    ("Mitchell Decl.," Dkt. No. 28-4) ¶¶ 2-3 (noting he participated in the fast during Ramadan 2019

16    and "received my Kosher Diet Program [] meals the entire month from prison staff without

17    incident."); Declaration of Paul Hamilton ("Hamilton Decl.," Dkt. No. 28-5) ¶¶ 1-4 (declaring that

18    he has "participated in every single ramadan" at San Quentin over past 5 years and that he has also

19    been on the "Kosher diet program" and that these "practices" have not prevented him "from

20    participating in the ramadan ceremonies which has enabled me to receive all benefits available to

21    all muslims" at San Quentin "during and throughout the month of ramadan.").

22    **III.    SMITH'S RAMADAN 2019**

23    Williams testified that at some undisclosed point "[a]head of Ramadan 2019, [he] was

24    advised that kosher meals were not shelf-stable.  Inmates who wished to observe the Ramadan fast

25    were instructed to sign up for the RMA or standard mainline meals."  Williams Decl. ¶ 26.  Smith

26    did not switch because of his fears of cross-contamination and because he did not want to lose the

27    KDP meals at the end of Ramadan.  Smith Decl. ¶ 15; AGO000384 (the 2019 Ramadan Memo

28    permitted Ramadan participating inmates who are enrolled in the KDP to transfer diets "no later

United States District Court
Northern District of California

United States District Court
Northern District of California

1  than Monday, April 29, 2019"); Dkt. No. 28-3 Losacco Memo. (noting that an inmate could only

2  transfer diets once a year).

3       For the first two days of Ramadan 2019, Smith received his KDP meals.  Smith Decl. ¶ 10.

4  For those first two days, Pelican Bay prison staff delivered the KDP meals from the main kitchen

5  to Facility D approximately 30 minutes before sundown with the use of "hot carts" to maintain the

6  temperature of the food.  Id.; Smith Dep. 70:17-17; cf. Defendant Williams' Response to

7  Plaintiff's First Set of Interrogatories, Nos. 5 & 8, pp. 3-4 (Dkt. No. 28-6) ("During Ramadan

8  2019, KDP meals continued to be sent from the main kitchen to Facility D's kitchen," "Ramadan

9  dinner meals are kept warm until an inmate could be escorted to pick up his meal").  On May 7,

10  2019, when Smith went to retrieve his dinner, he was told by prison staff that KDP meals would

11  no longer be available through the remaining 28 days of Ramadan; he assumes this occurred asa

12  result of the Gipson Memo.  Id. ¶11.  During the remainder of 2019 Ramadan, and despite shelf-

13  stable sack meals having been reserved for him, Smith was "fed no prison meals whatsoever" and

14  he was forced to subsist on peanut butter and jelly sandwiches and instant soups given to him by

15  other inmates.  Id. ¶ 13.

16       Defendant Williams, Pelican Bay's Correctional Food Manager, ordered KDP meals based

17  on the number of inmates in the program (including Smith) and then ordered shelf-stable sack

18  meals based on the number of inmates who were planning to observe Ramadan, including meals

19  designated for Smith.  William Decl., ¶¶ 13, 18, 28-29.  During Ramadan 2019, Pelican Bay staff

20  prepared and reserved halal dinner plates for the inmates on the Ramadan participation list during

21  routine dinner preparation and kept the meals temperature controlled until after sunset when

22  custodial staff could distribute the hot meal. Id. ¶ 26.  Ramadan participants also received halal

23  shelf-stable sack meals during dinner service that could be consumed before the next sunrise. Id.

24  ¶¶ 18-19, 26.  Muslim inmates who had selected the RMA program received their evening meals

25  that day and throughout Ramadan 2019. Williams' Rog. Resp. (Dkt. No. 28-6) at Rog. 8.

26       According to defendants, kitchen staff did not have the resources or ability to provide an

27  additional hot-meal service to fasting Ramadan participants before sunrise. Williams Decl. ¶ 20.

28  Defendants likewise assert that the "dining schedule and procedures could not be modified without

6

United States District Court
Northern District of California

1   significant impact on prison security, staff coverage, welfare checks, and inmate programing.  *Id.*

2   ¶¶ 7, 20; Blythe Decl. ¶ 14; Richey Decl. ¶¶ 10, 12.

3          Defendants assert that despite being informed of the "Ramadan halal or mainline options,"

4   Smith did not enroll or try to enroll in an available program.  Pl.'s Depo. Tr. (Dkt. No. 25-5) at

5   95:9-14.  Smith does not indicate when he first learned about Pelican Bay's intended compliance

6   with the 2019 Ramadan Memo, but claims he received "late notification" that it would be "strictly

7   enforced" only when he went to receive his meal on May 7, 2019, two days into Ramadan.  *Id.* ¶

8   16; *see also* Williams Rog. Resp. at 4 ("Ramadan Participants who were still on the KDP were

9   given the choice of participating in Ramadan after sundown [without receiving KDP meals] or

10  continuing with the KDP at regular feeding times").

11         Williams testified that while he planned meal service for Pelican Bay during Ramadan

12  2019, he was never personally involved in the day-to-day meal-service in Facility D.  Williams

13  Decl. ¶¶ 24, 30.  He was not aware that Smith allegedly did not receive meals during Ramadan

14  2019.  Williams Decl. ¶ 30.  Smith does not allege that he informed any defendant that he was not

15  taking any meals on or after May 7, 2019.  He did file an administrative grievance on May 9,

16  2019, complaining about the deprivation of the KDP meals, but nowhere in that grievance did he

17  explain that he was not receiving any meals.  Smith Decl. ¶ 12; Elford Decl., Exh. 8

18  (Administrative Grievance, Dkt. No. 28-8) at 2-3; Smith Depo. Tr. 89:1-90:5. After three levels of

19  review, the warden denied the grievance on November 19, 2019.

20  **IV.    FACILITY D DINING HALL POLICY**

21         In addition to his Ramadan-2019 specific challenge, Smith's Complaint challenges the

22  Pelican Bay Facility D Dining Hall Policy ("Policy") more generally.  That Policy was

23  promulgated and implemented by defendant D. Blythe, the Captain of Facility D at Pelican Bay

24  during the relevant time period.  *See* Declaration of D. Blythe (Dkt. No. 25-3) ¶¶ 1-2.  Smith

25  alleges that the Facility D Policy prevented inmates from bringing their own cups or utensils into

26  the dining hall and from taking any part of the breakfast or dinner meals out of the dining hall (to

27  eat with non-cross contaminated cups and utensils and to heat food to its appropriate temperatures

28  in a communal microwave), and failed to provide sufficient flexibility so that practicing Muslims

7

United States District Court
Northern District of California

1    like Smith could observe fasts outside of Ramadan or participate in prayers. Complaint at 12, 14-

2    16.  Smith argues that the identified aspects of the Dining Hall Policy substantially burdened his

3    religious freedom by raising the risk of cross-contamination (from the common use of trays,

4    cups/bowls/utensils, and drinking water dispensers) and preventing him from observing his

5    religious needs as he desires.  *Id*.

6            Because Facility D was formerly a Secure Housing Unit without a dining hall, a special

7    dining policy had to be implemented when Facility D became a general population unit.  Blythe

8    Decl. ¶¶ 3-5.  The policy required that inmates eat their hot meals (breakfast and dinner) in the

9    dining halls and not in their cells, and that no breakfast or dinner items could leave the dining hall.

10   *Id.* ¶ 13, Ex. A.  This policy was adopted for efficiency and security purposes, ensuring that

11   inmates not eat spoiled food while preventing theft, bartering, or fights over food.  Blythe Decl. ¶¶

12   7, 11, 13; William Decl. ¶¶ 21-22.

13           Defendants submit evidence regarding how the trays, cups, and pots and pans at Pelican

14   Bay are cleansed between uses.  Williams Decl. ¶¶ 8-11.  Those cleaning and sanitization

15   practices, according to defendants' expert Syed, minimize – but do not wholly eliminate – the

16   chance of cross-contamination and comply with Islamic practices in the community.  *See* Syed

17   Expert Report at 5-6.  Defendants also rely on Syed to opine that improperly or under-warmed

18   pre-cooked food is not in violation of Islamic beliefs, and that water dispensers, even if used by

19   other inmates, are halal if they contain only water.  *See* Syed Expert Report at 6.

20   **V.     PROCEEDURAL HISTORY**

21           Proceeding *pro se*, on February 12, 2020, Smith filed suit alleging a claim for violation of

22   the Religious Land Use and Institutionalized Persons Act ("RLUIPA," 42 U.S.C. § 2000cc *et seq*.)

23   and constitutional claims for violation of the Free Exercise Clause, violation of the Eighth

24   Amendment, and violation of his rights to equal protection.  Complaint, Dkt. No. 1.  Subsequently,

25   he secured counsel.  Dkt. No.18.

26           The defendants' motion for summary judgment argues that: (1) the 2019 Ramadan Policy

27   did not violate Smith's Free Exercise rights under RLUIPA or the First Amendment because (a)

28   his beliefs were not substantially burdened, (b) the RMA-alternative is the least-restrictive means

in promoting food safety, security, and efficiency under RLUIPA, (c) the Policy satisfies the deferential *Turner* test and (d) the defendants are entitled to qualified immunity; (2) the Equal Protection claim fails against Gipson because there was no unequal treatment and the 2019 Ramadan Policy was reasonably related to legitimate penological interests; (3) no Eighth Amendment claim can be asserted against the defendants because they were not directly involved in denying Smith meals and none of them knew Smith was missing meals during 2019 Ramadan, and they are entitled to qualified immunity; and (4) the First Amendment challenge to the Facility D dining hall policy is moot and fails on its merits.  Smith's cross-motion for partial summary judgment contends that the 2019 Ramadan Policy violates (1) RLUIPA, (2) the Free Exercise Clause; (3) the Eighth Amendment; and (4) his rights to Equal Protection.

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  To prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id*. The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant.  *Id*. at 255.  In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id*.  However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment.  *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

United States District Court
Northern District of California

**DISCUSSION**

**I.    RLUIPA AND FREE EXERCISE CLAIM**

    **A.    Legal Standards**

        **1.    Free Exercise**

Inmates "have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their religion." *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987). Allegations that prison officials refuse to provide a healthy diet conforming to sincere religious beliefs states a cognizable claim under § 1983 of denial of the right to exercise religious practices and beliefs. *See Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993) (Jewish inmate claiming denial of kosher diet), cert. denied, 510 U.S. 1192 (1994); *McElyea*, 833 F.2d at 198 (same); *Moorish Science Temple, Inc. v. Smith*, 693 F.2d 987, 990 (2d Cir. 1982) (Muslim inmate claiming denial of proper religious diet).

Once an inmate demonstrates that a prison policy burdens a sincerely held religious belief, the burden shifts to prison officials to prove that the burden on plaintiff's exercise of religion was reasonably related to a legitimate penological objective. *See Ashelman v. Wawrzaszek*, 111 F.3d 674, 677-78 (9th Cir. 1997) (applying test from *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987), and *Turner v. Safley*, 482 U.S. 78 (1987), to determine reasonableness of decision denying Jewish inmate's request for an all-kosher diet).

        **2.    RLUIPA**

Congress enacted the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1, pursuant to its Spending Clause and Commerce Clause authority. *Sossamon v. Texas*, 563 U.S. 277, 278 (2011). Section 3 of RLUIPA provides: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 [which includes state prisons], even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a).

The statute applies "in any case" in which "the substantial burden is imposed in a program

1    or activity that receives Federal financial assistance."  42 U.S.C. § 2000cc-1(b)(1).  RLUIPA also

2    includes an express private cause of action that is taken from the Religious Freedom Restoration

3    Act ("RFRA," 42 U.S.C. §§ 2000bb - 2000bb-4): "A person may assert a violation of [RLUIPA]

4    as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."

5    42 U.S.C. § 2000cc-2(a); cf. § 2000bb-1(c).

6         Congress intended to distinguish RLUIPA from traditional First Amendment Free Exercise

7    jurisprudence in at least two ways.  First, it expanded the reach of the protection to include "'any

8    religious exercise,'" including 'any exercise of religion, whether or not compelled by or central to,

9    a system of religious belief.'"  *Greene v. Solano County Jail*, 513 F.3d 982, 986 (9th Cir. 2008)

10   (quoting *Cutter v. Wilkinson* 544 U.S. 709, 714 (2005) and 42 U.S.C. §2000cc-5(7)(A)).

11   RLUIPA, therefore, "bars any inquiry into whether a particular belief or practice is 'central' to a

12   prisoner's religion."  *Greene*, 513 F.3d at 986.  But a prisoner's request for an accommodation still

13   must be sincerely based on a religious belief and not some other motivation.  *Holt v. Hobbs*, 574

14   U.S. 352, 360-61 (2015).

15        Second, as opposed to the deferential rational basis standard of *Turner v. Safley*, 482 U.S.

16   78 (1987), RLUIPA requires the government to meet the much stricter burden of showing that the

17   burden it imposes on religious exercise is "'in furtherance of a compelling governmental interest;

18   and is the least restrictive means of furthering that compelling governmental interest.'"  *Greene*,

19   513 F.3d at 986 (quoting 42 U.S.C. § 2000cc-1(a)(1)-(2)).  "Congress has explicitly directed

20   [courts] to resolve any ambiguities in RLUIPA 'in favor of a broad protection of religious

21   exercise, to the maximum extent permitted.'"  *Khatib v. County of Orange*, 639 F.3d 898, 900-01

22   (9th Cir. 2011) (*en banc*) (citing and adding emphasis to 42 U.S.C. § 2000cc-3(g)).  "RLUIPA's

23   requirements are not unlimited, however; "if 'inmate requests for religious accommodations

24   become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the

25   effective functioning of an institution,' a prison system may 'resist the imposition.'" *Fuqua v.

26   Ryan*, 890 F.3d 838, 844 (9th Cir. 2018) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 726 (2005)).

27        RLUIPA does not authorize suits against state actors (including prison officials) acting in

28   their individual capacity.  *Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014) (agreeing with other

United States District Court
Northern District of California

11

circuits addressing this issue). Claims may only be brought against such defendants in their official or governmental capacity. *Id*. at 904. RLUIPA, however, does not authorize money damages against state officials, whether sued in their official or individual capacities. *See Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015). Therefore, injunctive relief is the only remedy provided against state officials under RLUIPA.

### B. Mootness

#### 1. 2019 Ramadan Policy

Defendants argue that the RLUIPA claim providing only injunctive relief is moot because Smith is no longer housed at Pelican Bay. *See, e.g., Dilley v. Gunn*, 64 F.3d 1365, 1369 (9th Cir. 1995) (dismissing as moot inmate's claim about inadequate access to a particular law library at a particular prison where it was unlikely that prisoner, who was reclassified and transferred to a lower class of inmate, might be transferred back to higher classification prison where law library access was the issue). When read broadly, Smith's Complaint challenges the CDCR policy (as stated in the 2017 and 2019 Ramadan Memos) of denying inmates observing Ramadan access to the KDP meals. While he specifically addresses Pelican Bay's implementation of the 2019 Ramadan Memo, defendants present no evidence or other information about whether the Ramadan Memo is still in effect and, absent that evidence, why it might not be applied to Smith in his current location. *See, e.g., Walker v. Beard*, 789 F.3d 1125, 1132 (9th Cir. 2015) (recognizing that prisoner's claim was not moot where "the policy pursuant to which the alleged violation occurred was 'system wide' and one of the defendants was in charge of the policy") (citing *Nelson v. Heiss*, 271 F.3d 891, 893, 897 (9th Cir.2001)).

While Gipson may not have "developed" the 2019 Ramadan Memo, she reviewed, signed, and authorized it. Absent any evidence from the defendants that the 2019 Ramadan Memo has been materially altered or that Smith will not be subject to it again, his challenge is not moot.

#### 2. Facility D Dining Hall Policy

The result is different, however, for the Facility D Dining Hall Policy. According to undisputed testimony from Blythe, the Dining Hall Policy was a discrete policy that was intended to evolve over time; it was put in place in April 2019 when Facility D was transitioning from a

secure housing unit to a general population unit.  Blythe Decl., ¶¶ 3-5.  Plaintiffs' transfer means that his RLUIPA claim, which provides only injunctive relief, is moot.

As to a damages claim under the First Amendment – assuming that the Dining Hall Policy imposed a substantial burden on Smith's right to practice Islam and was not sufficiently justified by penological concerns-- defendants argue that Blythe is protected by qualified immunity.  I will address that below.

### C.   Substantial Burden

RLUIPA does not define "substantial burden."  *San Jose Christian College*, 360 F.3d at 1034.  Construing the term in accord with its plain meaning, the Ninth Circuit has held that "a 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise."  *Id.*; *see Greene*, 513 F.3d at 988 (jail's ban prohibiting a maximum security prisoner from attending group religious worship services substantially burdened his ability to exercise his religion).  A burden is substantial under RLUIPA when the state "'denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs.'"  *Shakur v. Schriro*, 514 F.3d 878, 888 (9th Cir. 2008) (quoting *Thomas v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 717-18 (1981)); *cf. Navajo Nation v. United States Forest Service*, 535 F.3d 1058, 1069-70 & n.12 (9th Cir. 2008) (*en banc*) (defining "substantial burden" under RFRA as government action that coerces plaintiff into acting contrary to religious beliefs under threat of sanctions or that conditions governmental benefit upon conduct that would violate religious beliefs, but not such action that diminishes subjective spiritual fulfillment).[4]  It is irrelevant for RLUIPA purposes whether the prisoner is able to engage in other forms of religious exercise.  *See id*. at 862.

---

[4] *See also Walker v. Beard*, 789 F.3d at 1134 (9th Cir. 2015) (prison's refusal to accommodate inmate's request not to be housed with non-white inmate was a substantial burden on inmate's practice of his "warding ritual," which forbids the presence of non-Aryans during its exercise); *Holt*, 547 U.S. at 352 (prison's grooming policy prohibiting the growing of beards substantially burdened a Muslim prisoner's exercise of religion under RLUIPA by forcing prisoner either to shave his beard and thereby engage in conduct that seriously violates his religious beliefs, or to contravene policy and grow a beard and thereby face serious disciplinary action).

United States District Court
Northern District of California

1

2

### 1.      2019 Ramadan Policy

Defendants argue that there is no evidence that the 2019 Ramadan policy as enacted by Pelican Bay caused a substantial burden on Smith's religious freedom because CDCR's halal diet program was fully available and designed to satisfy the dietary requirements of observant Muslims during Ramadan, including by providing a higher-calorie sack meal (to be consumed before sunrise) and a daily hot halal dinner.  William Decl.  ¶¶ 12, 15, 18; Richey Decl. ¶¶ 5, 11. Defendants argue that Smith's subjective and, on this record, unsubstantiated concerns regarding cross-contamination cannot create a substantial burden on his faith.  Smith Depo. Tr. 114-115, 131, 133-135.[5]

Smith defines "his sincere religious belief" as "the avoidance of Halal food likely to be cross-contaminated by Haram food."  Pl MSJ at 9.  He argues that there can be no doubt of the sincerity of his belief and concern over cross-contamination, given that his request for the KDP plan was approved in 2018 and that he went hungry during Ramadan 2019 instead of switching to the RMA plan.  Smith Decl. ¶ 15.  He testified that although he had not worked in the kitchens at Pelican Bay nor personally witnessed the food preparations at Pelican Bay, he had first-hand knowledge of food preparations for prison meals because of his work in the kitchen at San Quentin within CDCR.  Smith Depo. Tr. at 133-134.  In that kitchen he witnessed cross-contamination, namely using the same cooking utensils to prepare permissible halal foods with remnants of haram food clearly visible in the cooking pots, that would make any reasonable person concerned about cross-contamination.  *Id*.  There is no "separate" halal preparation area in Facility D, and Smith argues that CDCR's Operation Manual specifies the need for separate stations only for the preparation of kosher meals and does not separately address separate stations

---

[5] Smith asserts that cross-contamination would occur unless cookware were washed six times, but Syed declared without contradiction that Smith's belief is inconsistent with the predominant practice of the Muslim community.  *See* Syed Expert Report at 5-6.  Smith claims that one of CDCR's halal vendors, Midmar, had been found to have falsely certified meat as halal, Pls. Oppo. at 6 n3, but failed to show that Midmar was supplying Pelican Bay during the relevant time period. Further, Smith admitted in his deposition that when he discovered the Midmar fraud, he stopped eating the meat but stayed on the RMA diet.  *See* Smith Depo. Tr. at 114-115; *see also* Syed Report at 6-7 ("For the former claim, the evidence of fraudulent practice by one halal-meat supplier does not impugn the credibility of all halal food suppliers. Religious law and the practice of the community dictate that one may consume another halal supplier's food as long as no subsequent positive evidence of fraud or deception emerges.").

1    for the preparation of RMA meals. *Compare* AGO000448, AGO000450-51 (providing for kosher

2    for Passover workstations) *with* AGO000453-55 (RMA provides only for replacement of chicken

3    or beef with halal meats).

4            Finally, Smith relies on Syed's testimony that religious scholars have recognized that if a

5    person has a "reasonable basis" to suspect cross-contamination even if the person does not witness

6    it, out of "precaution" a person could reasonably avoid potentially haram food. Dkt. No. 31-1,

7    Syed Depo. Tr. at 20-24, 47-48. Syed did explain in his Report that "in the absence of knowledge

8    of PBSP's washing practices of cooking utensils between cooking sessions, Smith's avoidance

9    based on the principle of precaution would be a minority view and practice" but went onto

10   recognize that "[a]s long as washing practices entail thoroughly washing food preparation

11   containers and utensils between the different cooking sessions which may involve contact with

12   forbidden substances, then Smith does not have sufficient evidence from a religious perspective

13   for his belief that the utensils cause cross-contamination." Expert Report at 5-6.

14           Syed also testified that it would be reasonable for Muslins, who had general knowledge

15   about "public non-Muslim kitchen" practices (such as a restaurant that has only one grill for both

16   halal and haram foods) to avoid eating at that restaurant as a precaution to avoid potential cross-

17   contamination. Syed Depo. Tr. at 47-48, 69-71, 81-82. But the analogy to reasonably avoiding a

18   general-service (non-halal) restaurant is strained when compared to avoiding food at an institution

19   (like Pelican Bay) that is legally required to provide halal foods to inmates and has developed

20   policies for the preparation of halal food.

21           Here, there is a lack of any evidence of actual cross-contamination at Pelican Bay during

22   the relevant timeframe, a lack of evidence showing that the kitchen policies and practices at

23   Pelican Bay created some reasonable likelihood of cross-contamination occurring (other than not

24   having separate preparation facilities), and a lack of evidence from Smith himself about his

25   experiences at Pelican Bay that would support a "reasonable belief" that cross-contamination had

26   occurred or was likely occur. The question then becomes whether Smith's sincere, subjective but

27   unsubstantiated concerns, based only on the fact that RMA meats were heated and served from a

28   joint kitchen with haram foods and his experiences with not-sufficiently-cleaned cookware at a

United States District Court
Northern District of California

United States District Court
Northern District of California

1    different prison, could reasonably demonstrate that defendants' requirement that Smith elect a

2    RMA meal during Ramadan 2019 to receive a post-fast hot meal imposed a substantial burden on

3    his reasonable religious beliefs.

4          Smith cites no caselaw to support this view.  He contends instead that under RLUIPA, the

5    religious belief at issue need not be "mandatory" or "central" under the religion's teachings and

6    that a violation can be shown where the state action at issue prevents a religious adherent from

7    engaging in conduct which he "sincerely believes is consistent with his faith."  *Cf. Navajo Nation*

8    *v. U.S. Forest Serv.*, 535 F.3d 1058, 1063 (9th Cir. 2008) (where "Plaintiff Indian tribes and their

9    members consider the San Francisco Peaks in Northern Arizona to be sacred in their religion.

10   They contend that the use of recycled wastewater to make artificial snow for skiing on the

11   Snowbowl . . . will spiritually contaminate the entire mountain and devalue their religious

12   exercises" court determined there was no substantial burden as "the sole effect of the artificial

13   snow is on the Plaintiffs' subjective spiritual experience. That is, the presence of the artificial

14   snow on the Peaks is offensive to the Plaintiffs' feelings about their religion and will decrease the

15   spiritual fulfillment Plaintiffs get from practicing their religion on the mountain.  Nevertheless, a

16   government action that decreases the spirituality, the fervor, or the satisfaction with which a

17   believer practices his religion is not what Congress has labeled a 'substantial burden'—a term of

18   art chosen by Congress to be defined by reference to Supreme Court precedent—on the free

19   exercise of religion.").

20         But Smith was required to present adequate evidence on summary judgment to support his

21   claim that his belief about cross-contamination was reasonable and that, as a result, defendants'

22   requirement that he choose the RMA during Ramadan 2019 substantially burdened his beliefs.

23   *See Boyd v. Etchebehere*, 2017 WL 2791660, at *10 (E.D. Cal. June 27, 2017), *report and*

24   *recommendation adopted*, 2017 WL 4048722 (E.D. Cal. Aug. 9, 2017), *aff'd*, 732 Fed. Appx. 608

25   (9th Cir. 2018) (unpublished) ("There is no evidence before the Court to suggest that the food

26   provided by the RMA diet would be impermissible for purposes of breaking Plaintiff's fast each

27   night of Ramadan."); *see also Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1316–17 (10th Cir. 2010)

28   ("It is a reasonable inference that ODOC's failure to provide a halal diet either prevents Mr.

Abdulhaseeb's religious exercise, or, at the least, places substantial pressure on Mr. Abdulhaseeb not to engage in his religious exercise by presenting him with a Hobson's choice—either he eats a non-halal diet in violation of his sincerely held beliefs, or he does not eat."); *Hunafa v. Murphy*, 907 F.2d 46, 46–47 (7th Cir. 1990) (inmate was put to "an improper choice between adequate nutrition and observance of the tenets of his faith" where prison officials admitted that while compartmentalized food trays were in transit, "there [was] no guarantee that some of the pork food items did not "run together" with the halal items); *see also Jackson v. Hill*, 128 Fed. Appx. 595, 597 (9th Cir. 2005) (unpublished) ("Jackson contends that defendants violated his First Amendment rights by preparing and serving food with utensils that had previously been in contact with food items prohibited under Islamic law. This contention lacks merit because defendants offered evidence that the food preparation, service and washing procedures did not violate Islamic law, and Jackson failed to offer any evidence to the contrary."); *but see Shakur v. Schriro*, 514 F.3d 878, 889 (9th Cir. 2008) (remanding to district court to resolve factual dispute over "the extent to which Shakur's gastrointestinal problems interfered with his religious activities" in light of evidence of physical problems related to inmate's consumption of the vegetarian-halal option).

In sum, there is no evidence that requiring Muslim-inmates to switch to the RMA plan during Ramadan 2019 in order to receive a hot post-fast meal substantially burdened Smith's sincerely held religious belief. Defendants' evidence stands unrebutted. CDCR created the RMA plan specifically to provide Muslim inmates with halal-compliant meals. Pelican Bay implemented that plan and provided halal-compliant meals while using industry-standard practices to cleanse utensils, cups, and cookware to prevent cross-contamination. A material disputed fact is not created by an unreasonable belief – based on no direct or circumstantial evidence – that there might be some risk of cross-contamination, particularly in the institutional setting where defendants are required to provide halal-compliant meals.

### 2.    Facility D Dining Hall Policy

Defendants argue that Blythe's Facility D dining hall policy did not substantially burden Smith's religious exercise. They assert that "[t]here is no evidence of a risk of cross-contamination" that would have necessitated accommodating Smith's desire to remove food from

1    the Dining Hall to eat in his cell and that he could engage in self-help to ameliorate any such risk,

2    as outlined in the Syed Expert Report (that explained Smith could avoid the tray return slot where

3    haram food might be present and use utensils to eat his food if there was a chance he had touched

4    haram foods).  Syed Expert Report at 5-6.

5         Smith contends that he has presented evidence that "such risk exists."  *See* AGO000448,

6    AGO000450-51 and AGO000453-55 (outlining RMA plan where only meat is specifically halal

7    and the remainder of RMA meals comes from the mainline meals and noting the absence of

8    separate RMA preparation facilities).  As with his challenge to the 2019 Ramadan Policy,

9    however, his argument is based on pure speculation and is insufficient to demonstrate a substantial

10   burden on his right to practice his religious beliefs.

11        Smith also argues that Syed "disavows" giving his opinion about cross-contamination in

12   Pelican Bay or other prisons because he has no knowledge of what prison kitchens "actually do."

13   *See* Syed Depo. Tr. at 95:5-96:11. But Smith provides no evidence that the cookware, utensil, tray

14   or dish cleaning and handling procedures at Pelican Bay following "industry-standard sanitation

15   practices" – practices that according to Syed would be sufficient if followed to prevent cross-

16   contamination – are *not* followed by Pelican Bay.  Williams Decl. ¶¶ 8-11.

17        As to the self-help measures referenced by defendants – that Smith could avoid haram food

18   remains when returning his tray and could avoid any impact from inadvertent touching of haram

19   foods by using utensils to consume his food – Smith claims that those measures are inadequate,

20   citing Syed's testimony that such self-help measures do not address the issue of cross-

21   contamination in the *preparation* of the meals. Syed Dep. 95:5-11. But Smith has not shown that

22   such cross-contamination occurred.

23        Finally, Smith complained that the Dining Hall Policy prohibiting removal of food from

24   breakfast and dinner meals prevented him from engaging in unspecified additional fasts and

25   prayers that conflicted with dining-hall times.  Yet he did not provide any evidence – either by

26   declaration or in his deposition – to identify or otherwise demonstrate when or how often the

27   Policy prevented him from engaging in fasts outside of Ramadan or prevented him from engaging

28   in prayers.  Smith Depo. Tr. at 120-122 (Smith was not able to estimate in a month, how often his

United States District Court
Northern District of California

18

prayer schedule would conflict with dining hall times); *see also Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993) ("The second *Turner* factor requires us to consider whether Ward has alternative means by which he can practice his religion. The relevant inquiry under this factor is not whether the inmate has an alternative means of engaging in the particular religious practice that he or she claims is being affected; rather, we are to determine whether the inmates have been denied all means of religious expression.").

Smith's challenge to the Facility D Dining Hall Policy fails because Smith has not shown that it imposed a substantial burden on his ability to practice his religion. Accordingly, I need not address the defendants' required showing under either the RLUIPA or *Turner* standards respectively: (i) that the policies further compelling government interests and are the least restrictive means to serve that interest; or (ii) that the policies are reasonably related to legitimate penological interests, that there are alternative means of exercising the right that remain open to prison inmates, considering the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally, and that there is an absence of ready alternatives.

That said, even if Smith had shown a substantial burden on his ability to practice his religion as a result of the policies, the government's evidence demonstrates how and why Pelican Bay implemented both the 2019 Ramadan Memo and the Facility D Dining Hall Policy in order to serve compelling government interests and that no less restrictive alternatives were available absent significant operational costs and disruptions and security risks. That showing will be briefly discussed below.

### D.  RLUIPA Compelling Interest

Once a plaintiff makes the requisite showing under RLUIPA of a substantial burden on the exercise of his religion, it becomes the defendant's responsibility to establish that the burden furthers "a compelling government interest" and does so by "the least restrictive means." *Greene*, 513 F.3d at 988 (quoting 42 U.S.C. § 2000cc-1(a) and § 2000cc-2(b)) (finding district court erred in granting summary judgment where a genuine issue of fact remained as to whether the jail's total ban on group religious worship by maximum security prisoners was the least restrictive means of

1   maintaining jail security); *cf. Walker v. Beard*, 789 F.3d at 1130 (9th Cir. 2015) (prison's

2   classification of a white racist inmate as eligible to be housed with a person of a different race and

3   its refusal to grant him an exemption did not violate Aryan Christian Odinist inmate's religious

4   rights under RLUIPA because prison's policy was least restrictive means of complying with

5   constitutional restrictions on racial segregation in prisons).

6         Under RLUIPA, prison officials cannot justify restrictions on religious exercise by simply

7   citing the need to maintain order and security in a prison.  *Greene*, 513 F.3d at 989-990.  RLUIPA

8   requires a "more focused inquiry" and requires the government "to demonstrate that the

9   compelling interest test is satisfied through application of the challenged law . . . [to] the particular

10  claimant whose sincere exercise of religion is being substantially burdened." *Holt*, 135 S. Ct. at

11  863 (citation and internal quotation marks omitted).  Prison officials also must show that they

12  "actually considered and rejected the efficacy of less restrictive measures before adopting the

13  challenged practice."  *Greene*, 513 F.3d at 989-90 (citation omitted); *see also Shakur*, 514 F.3d at

14  891 (finding grant of summary judgment was not appropriate on RLUIPA claim because factual

15  disputes existed as to the extent of the burden on plaintiff's religious activities, the extent of the

16  burden on the prison that would be created by accommodating plaintiff's request, and the

17  existence of less restrictive alternatives).  If prison officials meet this standard, the prison

18  regulation passes muster under RLUIPA, regardless of the burden it imposes on religious exercise.

19  *Greene*, 513 F.3d at 989-990.

20        The least-restrictive means standard under RLUIPA is exceptionally demanding and

21  requires the government to show that it lacks other means of achieving its desired goal without

22  imposing a substantial burden on the exercise of religion of the objecting party.  *Holt*, 135 S. Ct. at

23  864.  If a less restrictive means is available for the government to achieve its goals, the

24  government must use it.  *Id.* at 864.[6]  Moreover, where "a prisoner challenges their justifications,

25  _____

26  [6] In *Holt*, prison officials defended their no-beard policy on the grounds that it prevents prisoners from hiding contraband and from disguising their identities.  But the Court found that prison
27  officials could not show that forbidding the half-inch beard exception the Muslim prisoner plaintiff sought was the least restrictive means of preventing the concealment of contraband or the
28  disguising of identities – prison officials failed to establish that they could not satisfy their security concerns by simply searching petitioner's beard or that they could not satisfy their prisoner

United States District Court
Northern District of California

1    prison officials must set forth detailed evidence, tailored to the situation before the court, that

2    identifies the failings in the alternatives advanced by the prisoner."  *May v. Baldwin*, 109 F.3d

3    557, 564–65 (9th Cir. 1997).

4           Defendants submit unrebutted evidence that the 2019 Ramadan policy is justified by

5    compelling interests: the KDP hot meals (breakfast and dinner) were not "shelf-stable" and could

6    not be brought back to an inmate's cell for later consumption without significant risk of

7    spoliation.[7]  They also submit unrebutted evidence that operational costs and considerations

8    precluded Pelican Bay from adding in a separate special pre-sunrise hot breakfast for KDP-

9    Ramadan participants and from serving post-sunset hot KDP dinners to Ramadan-participants.

10   Richey Decl. ¶¶ 9, 13, 20; William Decl. ¶¶ 7, 20); Blythe Decl. ¶¶ 14, 16.

11          Smith points out that other prisons in the CDCR system provided KDP hot dinner meals to

12   Ramadan observants in 2018 and 2019, and that Pelican Bay used hot carts to provide KDP meals

13   for the first two nights of Ramadan 2019.  But given that there were no kitchen facilities in

14   Facility D in 2019, there is no evidence that continuing to serve hot KDP meals using warm carts

15   would have eliminated the risk of spoliation or that Pelican Bay would have been able to continue

16   using the warm carts for the remaining 28 days without causing significant disruption to its

17   operational costs and security.

18          The only ways to avoid that risk were to waste the KDP hot breakfast *and* add calories to

19   the shelf-stable KDP lunch bag *or* to radically alter the meal service during Ramadan to provide

20   first an after-sunset hot meal (which they offered for RMA participants as prepared during

21   mainline meal and kept warm), expanding the service to keep some subset of KDP meals (for

22   KDP-Ramadan participants) warm for some period of time too.  The prison would then also have

23   to provide a wholly new hot meal service for the limited number of KDP-Ramadan participants

24

25   identification concerns by requiring petitioner to be photographed both with and without a half-
     inch beard and then periodically thereafter.  *See id*. at 864-65.

26

27   [7] That is even if the Facility D Dining Hall Policy – implemented when Facility D became a
     general population unit and when Facility D did not have its own kitchen facilities – could have
     been altered to allow inmates to remove food from the breakfast and dinner meals from the dining
28   hall.

before sunrise.  Richey Decl. ¶¶ 10, 12; Williams Decl. ¶¶ 7, 20.[8]  Defendants argue that neither is required under RLUIPA or *Turner*.  The testimony of Williams and Blythe – that to adopt either of these alternative plans would cause significant operational disruption and security concerns – is unrebutted.

While Smith characterizes the spoilation justification as a "pretext," he cites no discovery or other evidence to show that the spoilation issue is not legitimate.  *See, e.g., Warsoldier v. Woodford*, 418 F.3d 989, 1002 (9th Cir. 2005) (recognizing "CDC's compelling interest in maintaining prison security, health, and hygiene.").[9]  That KDP-Ramadan participants at Pelican Bay received their first two 2019 Ramadan KDP dinner meals after sunset does not prove that there was no spoilation risk or that to continue to do so would not have caused the significant operation costs and security concerns defendants identify given the unique circumstances at Facility D.

Defendants present evidence satisfying the compelling justifications standard because there was no less restrictive means available for Pelican Bay to achieve its goals of providing Ramadan participants sufficient calories in a bagged-meal to be consumed before sunrise and providing a halal-compliant evening hot meal after sunset. They cite evidence that they considered other alternatives – for example, adding a hot meal service prior to sunrise – but the operational costs of staff and added security measures were too great.  Richey Decl. ¶¶ 10, 12; William Decl. ¶ 20; Blythe Decl. ¶ 16.

Smith argues there were other obvious alternatives that would be less burdensome to prison operations, including: (1) serving the KDP meals after sundown (as they did with the RMA

---

[8] The defendants note that KDP meals could only be ordered in sets of 3 and not altered.  That means that the KDP sack-lunch could not be supplemented to provide the higher calories required during Ramadan (unlike the available RMA sack meal provided at night, to be eaten at prior to sunrise during Ramadan, that contained more calories than the normal sack meals provided for lunch throughout the year in the KDP, RMA, and mainline programs).  *See* Williams Decl. ¶¶ 15, 18.

[9] Plaintiff asserts that both "RMA and KDP" breakfast and lunch meals typically include only shelf-stable items, citing AGO000453-454.  But that document discusses options for a Ramadan stable-sack breakfast and lunch and includes slightly different options considering whether the sack is provided at night for next morning or in early morning to be consumed before sunrise.  Dkt. No. 35-3.

United States District Court
Northern District of California

dinner); (2) allowing inmates to take frozen KDP meals to their cells and reheat them in the communal microwave oven in Facility D and have the inmates sign a release regarding the shelf-stability of the KDP meals; or (3) serving bagged KDP breakfasts and lunches to inmates before sunrise, as the prison served milk to Ramadan participants.[10] Pl. MSJ at 11-12.  Smith contends that these alterations would be feasible and that similar ones are provided for Jewish inmates during their six annual fasting days, when they are given two KDP bagged lunches to be eaten after sundown. *See* AGO000003 (Dkt. No. 28-2, identifying the six fasting holy days and providing that inmates participating in the fasts "will not be provided any regular meals for the recognized fasting day" but will "instead be provided with an approved sack meal, to be eaten at the end of the fasting period.  The sack meal will be equivalent to two (2) kosher sack lunches."); AGO00000449 (same).

Allowing inmates to bring breakfast or dinner meals back to their cells at night where they would not be kept temperature stable (either warm or cold) for consumption at unknown times (by microwave) does not solve the spoliation problem.  Richey Decl. ¶¶ 13, 15, 20-21.  Smith's proposed solutions also ignore the consistent testimony that the KDP meal plan comes in sets of three (a breakfast and dinner served warm and in the dining hall, and a sack-lunch) and there is no evidence that KDP breakfast is or ever has been bagged.  That Pelican Bay may have accommodated some unknown number of Jewish inmates' fasting for six days over the course of a year is not equivalent to providing an unknown number of Muslim inmates the KDP meals over a full month during Ramadan, especially considering the specific limitations present in Facility D during that time.

Smith states that there is no evidence that Gipson considered any of the alternative options before she issued her memoranda; she simply followed Richey's advice and implemented the similar but inconsistently followed 2017 policy and did not inquire into the bases for the 2019 Ramadan policy until 2020.  Elford Decl., Ex. 11 (Jackson Email October 2, 2020).  However, Gipson's staff (Richey) and Pelican Bay staff did consider other options.  Richey Decl. ¶¶ 10, 12;

---

[10] AGO000380 (William Memo, noting milk served at 4:00 a.m. during Ramadan).

United States District Court
Northern District of California

1  William Decl. ¶ 20; Blythe Decl. ¶ 16.[11]

2        Finally, Smith argues that the existence of less-restrictive alternatives is shown by the

3  declarations of inmates at Solano State Prison (Mitchell) and San Quentin State Prison (Hamilton),

4  who declare they either received their KDP "meals" in 2019 Ramadan "without incident," Dkt.

5  No. 28-4 (Mitchell Decl), or received "all benefits" during and throughout Ramadan.  Hamilton

6  Decl., Dkt. No. 28-5.  Even if I were to read these declarations as Smith suggests, that evidence

7  does not address the unrebutted testimony regarding the particular limitations Pelican Bay faced

8  with Facility D.  The inmate declarations do not demonstrate how the other institutions addressed

9  the spoliation issue with the KDP meals or demonstrate that Pelican Bay could have delivered all

10  three KDP meals or some combination of meals in a Ramadan-consistent manner in Facility D

11  without significant disruption to its operations and security.

12        Defendants have demonstrated that their implementation of the 2019 Ramadan Memo

13  served a compelling interest and that less restrictive feasible alternatives were not available.

14        **E.    *Turner* Rational-Relationship**

15        Under the more-deferential *Turner* standard, courts must consider whether a prison

16  regulation impinges on inmates' constitutional rights is: (i) "reasonably related to legitimate

17  penological interests," (2) "whether there are alternative means of exercising the right that remain

18  open to prison inmates," (3) "the impact accommodation of the asserted constitutional right will

19  have on guards and other inmates, and on the allocation of prison resources generally," and (4)

20  "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Turner*

21  *v. Safley*, 482 U.S. 78, 89-90 (1987).

22        Having found that the defendants satisfy the more exacting RLUIPA standard, I conclude

23  that defendants necessarily satisfy the *Turner* standard for the implementation of the 2019

24

25  [11] Smith argues that the unspecified cost of his proposed accommodations is just a "drop" in the
   bucket considering CDCR's $13 billion annual budget.  He has provided no evidence from

26  defendants or from an expert of his own to dispute defendants' unrebutted evidence that in
   addition to adding cost-per-meals (if they were to add a second KDP sack lunch and waste the

27  KDP hot breakfast), the other options would not impose significant burdens in terms of staffing,
   altering security protocols, and altering quiet time and facility programming.  Richey Decl. ¶¶ 9,

28  10, 12, 13, 20 & Ex. B; Williams Decl. ¶¶ 7, 20; Blythe Decl. ¶¶ 14, 16.

United States District Court
Northern District of California

1    Ramadan Memo at Pelican Bay.  Defendants also satisfy the *Turner* standard with respect to the

2    Facility D Dining Hall Policy for Smith's remaining damages claim, given the unrebutted

3    testimony from defendant Blythe about why and how that Policy was implemented when Facility

4    D was transitioned to a general population unit.[12]

5        Defendants' motion for summary judgment on the RLUIPA and First Amendment claims

6    is GRANTED, and plaintiff's cross-motion is DENIED.

7    **II.    EIGHTH AMENDMENT**

8        The treatment a prisoner receives in prison and the conditions under which he is confined

9    are subject to scrutiny under the Eighth Amendment.  *See Helling v. McKinney*, 509 U.S. 25, 31

10   (1993).  In its prohibition of "cruel and unusual punishment," the Eighth Amendment places

11   restraints on prison officials who may not, for example, use excessive force against prisoners.  *See*

12   *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).  The Eighth Amendment also imposes duties on

13   these officials, who must provide all prisoners with the basic necessities of life such as food,

14   clothing, shelter, sanitation, medical care, and personal safety.  *See Farmer v. Brennan*, 511 U.S.

15   825, 832 (1994).

16       A prison official violates the Eighth Amendment when two requirements are met: (1) the

17   deprivation alleged must be, objectively, sufficiently serious, *Farmer*, 511 U.S. at 834 (citing

18   *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)), and (2) the prison official possesses a sufficiently

19   culpable state of mind.  *Id.* (citing *Wilson*, 501 U.S. at 297).  In determining whether a deprivation

20   of a basic necessity is sufficiently serious to satisfy the objective component of an Eighth

21   Amendment claim, a court must consider the circumstances, nature, and duration of the

22   deprivation.  The more basic the need, the shorter the time it can be withheld.  *See Johnson v.*

23   *Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).  Substantial deprivations of shelter, food, drinking water

24   or sanitation for four days, for example, are sufficiently serious to satisfy the objective component

25

26   _____

[12] As I have found that the implementation of the 2019 Ramadan Memo and the Facility D Dining
27   Hall policies did not substantially burden Smith's religious freedom and that those policies served
     compelling and legitimate government interests using the least restrictive means, I need not
28   address defendants' separate arguments that Gipson, Williams, and Blythe are protected from a
     damages award by qualified immunity.

United States District Court
Northern District of California

1     of an Eighth Amendment claim.  *See id.* at 732-733.

2          The requisite state of mind to establish an Eighth Amendment violation depends on the

3     nature of the claim.  In prison-conditions cases, the necessary state of mind is one of "deliberate

4     indifference."  *See, e.g., Farmer*, 511 U.S. at 834 (inmate safety); *Helling*, 509 U.S. at 32-33

5     (inmate health); *Wilson*, 501 U.S. at 302-03 (general conditions of confinement); *Estelle v.*

6     *Gamble*, 429 U.S. 97, 104 (1976) (inmate health).  Neither negligence nor gross negligence will

7     constitute deliberate indifference.  *See Farmer*, 511 U.S. at 835-37 & n.4; *see also Estelle*, 429

8     U.S. at 106 (establishing that deliberate indifference requires more than negligence).  A prison

9     official cannot be held liable under the Eighth Amendment for denying an inmate humane

10    conditions of confinement unless the standard for criminal recklessness is met, *i.e.*, the official

11    knows of and disregards an excessive risk to inmate health or safety.  *See Farmer*, 511 U.S. at

12    837.  The official must both be aware of facts from which the inference could be drawn that a

13    substantial risk of serious harm exists, and he must also draw the inference.  *See id.*

14         An Eighth Amendment claimant need not show, however, that a prison official acted or

15    failed to act believing that harm actually would befall an inmate; it is enough that the official acted

16    or failed to act despite his knowledge of a substantial risk of serious harm.  *See id.* at 842; *see also*

17    *Robins v. Meecham*, 60 F.3d 1436, 1439-40 (9th Cir. 1995) (bystander-inmate injured when

18    guards allegedly used excessive force on another inmate need not show that guards intended to

19    harm bystander-inmate).  This is generally a question of fact.  *See Farmer*, 511 U.S. at 842.  A

20    trier of fact may conclude that a prison official knew of a substantial risk from the very fact that

21    the risk was obvious; a plaintiff therefore may meet his burden of showing awareness of a risk by

22    presenting evidence of very obvious and blatant circumstances indicating that the prison official

23    knew the risk existed.  *Foster v. Runnels*, 554 F.3d 807, 814 (9th Cir. 2009) ("risk that an inmate

24    might suffer harm as a result of the repeated denial of meals is obvious").  But while obviousness

25    of risk may be one factor in demonstrating subjective knowledge, a defendant's liability must still

26    be based on actual awareness of the risk rather than constructive knowledge.  *Harrington v.*

27    *Scribner*, 785 F.3d 1299, 1304 (9th Cir. 2015).

28         Defendants argue that Smith's Eighth Amendment conditions of confinement claim fails

United States District Court
Northern District of California

1    because it is undisputed that neither Gipson or Williams knew or had reason to know that Smith

2    did not receive any meals (after the first two days) during Ramadan 2019.  The evidence instead

3    shows that KDP meals were reserved for Smith (presumably to be consumed during the normal

4    times, when he would be fasting and unable to remove them from the Dining Hall) but that

5    Ramadan sack meals were also available to him.  Williams Decl. ¶ 29.  The undisputed evidence

6    also shows that while Smith complained about being forced to switch to RMA from KDP in order

7    to receive hot meals during Ramadan 2019, he did not complain to anyone (including Gipson or

8    Williams who were not involved in day-to-day meal provision in Facility D) that he was not

9    receiving any meals after the first two days of Ramadan.

10        Smith responds that genuine disputes of material fact preclude summary judgment on the

11   Eighth Amendment claim.  He cites "circumstantial evidence" showing the risk of harm to him of

12   depriving him of his KDP meals during Ramadan 2019 and that defendants should have been

13   aware of the "risk" to Smith given that Smith would not "bow to the pressure of the [2019

14   Ramadan Policy] to violate religious beliefs and opt-out of the KDP to enroll in the RMA should

15   have been obvious to them."  Pl. Oppo. at 18.

16        Smith's Eighth Amendment claim fails on multiple bases, the primary one being Smith's

17   failure to show that his belief about cross-contamination at Pelican Bay was reasonable.  In

18   addition, Smith presents no evidence that Gipson (who authorized the 2019 Ramadan Memo) had

19   knowledge that some Muslim inmates had chosen the KDP meals because of fears of cross-

20   contamination or that she had reasons to suspect that.  Smith presents no circumstantial or direct

21   evidence that Williams (who implemented the 2019 policy) knew, or had reason to suspect, that it

22   would impact and cause deprivations for Muslim inmates who had elected to receive KDP meals.

23   The only evidence in the record is that the 2019 Ramadan Memo was issued and implemented at

24   Pelican Bay to protect inmates from the risk of spoilation given that the KDP meals were not

25   shelf-stable, and that providing them in Facility D for the whole of Ramadan as Smith suggested

26   would impose substantial operational costs and security disruptions without ensuring that

27   spoilation would not occur.

28        Smith presents no circumstantial or direct evidence that Gipson or Williams knew,

United States District Court
Northern District of California

1   suspected, or had reason to know or suspect that Smith elected the KDP meals because of his

2   beliefs regarding cross-contamination in the RMA plan.  Therefore, defendants had no reason to

3   suspect any injury could result from their imposition of the 2019 Ramadan Memo.  Smith's

4   election of KDP meals in 2018 does not mention cross-contamination.  Nor does the

5   administrative complaint Smith filed on May 9, 2019 (during Ramadan 2019) say that he was

6   refusing to switch to RMA because of fears of cross-contamination.  It only indicates that the

7   RMA diet was in unspecified "conflict with [his and other inmates] sincerely held beliefs." Dkt.

8   No. 28-8.  Nor does Smith dispute that he did not tell anyone during Ramadan 2019 that he was

9   not received meals, other than the correctional officer that was distributing food.  Smith Depo. Tr.

10   89-90.

11       Defendants' motion for summary judgment on the Eighth Amendment claim is

12   GRANTED and plaintiff's cross-motion for summary judgment that the 2019 Ramadan Memo

13   violated the Eighth Amendment is DENIED.

14   **III.   EQUAL PROTECTION**

15       The Equal Protection Clause entitles each prisoner to "a reasonable opportunity of

16   pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to

17   conventional religious precepts." *Cruz v. Beto*, 405 U.S. 319, 322 (1972).  Absent racial animus,

18   this claim is likewise analyzed under the *Turner* test; an equal protection claim will fail "if the

19   difference between the defendants' treatment of him and their treatment of Jewish inmates is

20   'reasonably related to legitimate penological interests.'" *Shakur v. Schriro*, 514 F.3d 878, 891 (9th

21   Cir. 2008) (quoting *DeHart v. Horn*, 227 F.3d 47, 61 (3d Cir.2000) (*en banc*), other internal

22   citations omitted).

23       The first step in determining whether an inmate's equal protection rights were violated is

24   to identify the relevant class of prisoners to which he belongs.  *Furnace v. Sullivan*, 705 F.3d

25   1021, 1030 (9th Cir. 2013).  The class must be comprised of similarly situated persons so that the

26   factor motivating the alleged discrimination can be identified.  *Id.* at 1031 (affirming district

27   court's grant of defendants' motion for summary judgment because inmate failed to raise triable

28   issue of fact that he was treated differently than any other inmate whom the officers did not know

was entitled to a vegetarian meal); *see also Gerber v. Hickman*, 291 F.3d 617, 623 (9th Cir. 2002) ("Gerber is not similarly situated to inmates who are eligible for conjugal visits. Inmates eligible for conjugal visits will eventually be released from prison, Cal. Code Regs. tit. 15 § 3174(e)(2), while Gerber will not. We therefore apply rationality review.").

Smith contends that because Gipson and Williams discriminated against Muslim inmates by issuing or implementing the 2019 Ramadan Memo, his claim must be reviewed under strict scrutiny and not under the deferential *Turner* test. The primary evidence of discriminatory aim and impact, according to Smith, is that CDCR and Pelican Bay find "ways to accommodate devout Jewish inmates when they fast for their six holy days" by providing them two KDP sack-lunches to eat after sundown but do not find ways of accommodating KDP-meal receiving Muslims during Ramadan. Pl. MSJ at 21; *see also* AGO000003 (Dkt. No. 28-2, identifying the six fasting holy days and providing that inmates participating in the fasts "will not be provided any regular meals for the recognized fasting day" but will "instead be provided with an approved sack meal, to be eaten at the end of the fasting period. The sack meal will be equivalent to two (2) kosher sack lunches."); AGO00000449 (same).

In the prison context, strict scrutiny applies only to race-based animus claims. Instead, the *Turner* standard applies.[13] In any event, Smith has offered no evidence of racial or religious-based animus (through depositions, written discovery, or otherwise) and has more fundamentally failed to show how Jewish inmates who fast for 6 days spread over the year (when some of those fasts last 24 hours or more and others are sunrise to sundown fasts) are similarly situated to Muslims who fast from sunrise to sundown for a full month.

I conclude that the provision by CDCR and Pelican Bay of two Kosher "equivalent" sack

---

[13] Smith also argues that the implementation of the 2017 Ramadan Policy following the decision *In re Garcia*, 202 Cal. App. 4th 892 (Cal. App. 3d Dist. 2012) shows discriminatory animus towards Muslims given that the Ramadan Policy was implemented for the next Ramadan following the *Garcia* opinion. *Garcia* held that CDCR violated RLUIPA when it refused to allow an inmate to participate in the KDP meal plan on grounds that inmate was not "a traditional Jew" but where the inmate claimed that maintaining a kosher diet was an integral part of his religious beliefs and the prison lacked any compelling interest in restricting existing kosher meals program to "traditional Jews." As explained above, *Garcia* does not control the analysis of Smith's claims.

United States District Court
Northern District of California

meals for some unspecified number of Jewish inmates who fast on these days spread out over the year does not make those inmates similarly situated to the unspecified number of Muslim inmates who are otherwise on the set-3 meal a day KDP – including the undisputed non-shelf stable hot breakfast and dinner meals – for a period of 30 days in a row.  Smith has not challenged defendants' evidence regarding the significant costs and operational difficulties (if not practical impossibilities) that would be required to provide KDP-compliant meals to Ramadan-observing inmates for 30 days in a row.  Richey Decl., ¶¶ 12, 25.[14]

Smith's lack of evidence at this juncture results – for reasons identified with respect to the RLUIPA and Free Exercise claims addressed above – in the failure of his Equal Protection claim as a matter of law and demonstrates that summary judgment should be granted to defendants on his Equal Protection claim.  *See also Jackson v. Hill*, 128 Fed. Appx. 595, 597 (9th Cir. 2005) (unpublished) ("Jackson contends that defendants violated equal protection guarantees by providing meat to Jewish inmates receiving a Kosher diet, but providing only a vegetarian Halal diet. This contention lacks merit because defendants offered evidence that the Kosher diet does not contain meat" and additionally "because he failed to present evidence either of discriminatory intent").

## CONCLUSION

Defendants' motion for summary judgment is GRANTED and plaintiff's cross-motion for partial summary judgment is DENIED.  Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

Dated: January 4, 2022

William H. Orrick
United States District Judge

---

[14] Smith also fails to address or wrestle with the implications of his argument given that inmates are required to be provided two hot meals a day, with limited exceptions.  AGO000006 (Dkt. No. 35-3), 15 CCR § 3050(a)(2) "Regular Meals,"states, "Inmates shall be provided three meals each day, two of which shall be served hot. Variations to the two hot meals per day requirement may be allowed to accommodate religious observances, religious meal programs, and institution emergencies."  There are obvious differences and rational reasons to distinguish between providing no hot meals (but two sack meals) for one day because of a religious fast and Smith's proffered alternative here, providing the same accommodation to Ramadan participants and thereby *not* providing any hot meals to them for 30 days in a row.